THIRD DIVISION
May 19, 2010

No. 1-08-0371

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| ZLATAN SUCIC, | ) | Honorable |
| | ) | Garritt E. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE QUINN delivered the opinion of the court:

Following a bench trial, defendant Zlatan Sucic was convicted of cyberstalking, harassment through electronic communication, and stalking. Defendant was sentenced to concurrent terms of three years in prison for each count. On appeal, defendant contends that: (1) the cyberstalking statute (720 ILCS 5/2-7.5(a)(1) (West 2008)) violated his first amendment right to free speech and is unconstitutionally overbroad and vague; (2) his convictions for cyberstalking and harassment through electronic communication violate the one-act, one-crime rule; (3) the State failed to prove him guilty beyond a reasonable doubt of cyberstalking, harassment through electronic communication, and stalking; and (4) his case should be remanded for a proper inquiry into his *pro se* allegations of ineffective assistance of counsel, as required by People v. Krankel, 102 Ill. 2d 181 (1984). For the following reasons, we affirm in part and vacate in part.

## I. BACKGROUND

At trial, Heather Stern testified that she is 35 years old and lives with her 6-year-old son, who is autistic, in an apartment in Park Ridge, Illinois. In spring 2006, Stern's home flooded and she sought temporary housing while she was involved in negotiations with her insurance company. Stern testified that she met defendant, a 43-year-old Serbian immigrant, through an on-line roommate matching service. Stern testified that although she did not become roommates with defendant, she maintained a friendship with defendant and met him on a monthly basis for coffee. Stern explained that she was interested in learning more of the Serbian language and defendant wanted to improve his English.

In July 2006, defendant and several other people helped Stern and her son move into a new apartment in Park Ridge, Illinois. Stern testified that, around that same time, she began working for defendant's granite business. Stern testified that she worked from home and performed general office work for defendant, including contacting clients, customer service, and bookkeeping. Defendant began staying overnight periodically at Stern's apartment while he was looking for a new apartment. Defendant did not have a key to Stern's apartment, but since Stern worked from home and had her son, she was usually home. At the time, defendant and Stern's son had a close relationship. Stern testified that defendant was supposed to pay her rent in addition to her salary. Stern testified that defendant often paid her in cash and would alternatively designate it as rent or pay, but still be behind on both. Stern testified that as a result, she and defendant argued about his payments and she ultimately quit working for defendant in November or December 2006.

Stern also testified that defendant's behavior changed in the summer of 2006. Stern testified that when she first met defendant "[h]e was very much a gentlemen." Stern testified that defendant became "pushy," "didn't respect boundaries," and "wasn't predictable." Stern testified that she informed defendant that she was not interested in a romantic relationship with him, but defendant "wouldn't take no for an answer." Stern testified, "[Defendant] had beliefs about how women should be *** and I didn't understand them and my refusal to agree with them was met with *** you're a bitch or you are stuck up or *** it makes you a slut, you must want to sleep with other men if you don't want to commit to me." Stern testified that she "wasn't comfortable with how [defendant] was dealing with the business or the personal relationship" and defendant stopped staying at her apartment on October 17 or October 18, 2006.

Stern testified that during the early morning hours on January 27, 2007, she was asleep on the couch in her living room when she heard a "jingling noise" from the back door handle "as if someone were attempting to open it." Stern testified that she became alarmed because no one ever used the back door and her son was asleep in his bedroom. Stern testified that she could not find her cellular phone, so she got a knife from the kitchen and ran to the back door. Stern testified that she slammed her weight against the back door and locked it as defendant was trying to open the door. Stern testified that defendant began screaming expletives at her, calling her a "bitch" and asking her, "Why are you doing this?" Stern testified that she "just freaked out" and did not call the police immediately because she "knew" defendant. Stern subsequently made a police report.

Stern testified that after the January 27, 2007 incident, defendant continued to leave her

1-08-0371

voice mail messages and send her e-mails. On February 19, 2006, Stern discovered that someone had deflated the tires on her car.

Stern testified that on March 13, 2007, she received a number of e-mails and voice mail messages from defendant. Stern identified People's exhibit 2, as an e-mail that defendant sent to her on March 13, 2007, at 1:57 a.m., which was part in English and part in Serbian.[1] The parties stipulated to translations into English from Serbian made by an official Serbian translator, Ivanka Kailovski. The subject of the e-mail was in Serbian and translated as "Lamb and its father=ME." The e-mail stated:

"MOLIM TE RAZMISLI STA RADIS

KADA DODJEM U PROBLEM, WITH FUTURE (BUDUCE VREME, FUTURE)

JA CU DA SE UBIJEM

(MY LIFE WILL VANISH) OR I WILL DO A SUACIDE [sic]

and. . . I TEBE VODIM SA SOBOM = MEANS 'I WILL END MY LIFE AND I AM

TAKEING [sic] you with me

[OR]

I'LL GIVE YOU AN OFFER!

IN ORDER NOT TO REPORT YOU TO STATE FARM, CALLING FEDS ON

---

[1]The parties stipulated that Jeff Stanford, a senior supervisor for legal services at Yahoo, Inc., would testify that the e-mails in question were sent from "TWRControl@yahoo.com" to "LuckyCharms_x_6@yahoo.com." Stern testified that these were defendant and her e-mail addresses, respectively.

-4-

INSURANCE FRAUD, AS A CON, WHICH IS FEDERAL OFFENSE, AND NO

BOND, MONEY, BROTHER, CAN SAVE YOU FROM JAIL, MEANING 5 YEARS

MIN., I'LL GIVE YOU AN OPTION, CONTRACT

SO CONTACT ME AS SOON AS POSSIBLE

THANK YOU

EYE FOR EYE, NOW THERE IS NO MOMENT FOR MERCY

YOU DID NOT HAD [sic] FOR ME

LET ME SHOW YOU WHO IS THE MAN"

The parties stipulated that the interpreter would testify that "the initial Serbian written on the email says please think what you are doing. When I am in a problem in the future, I will commit suicide, my life will vanish or I will do suicide and I will take you with me."

Stern next identified People's exhibit 4, a compact disc containing recordings of eight voice mail messages left by defendant on Stern's phone. These voice mails included a message left on March 13, 2007, at 2:57 a.m., after defendant sent the e-mail contained in People's exhibit 2, in which defendant asked Stern, *inter alia*, to read his e-mail, acknowledged deflating Stern's car tires, and indicated that Stern "should call [him] back *** for [her] sake." Defendant stated that "a person [who] is being destroyed *** should get even" and "if I get even, I get even big time, trust me." Defendant further stated that "this is your choice, you and me together or this *** insurance fraud" and that he "would not have done this unless it was in a matter of love."

Stern next identified People's exhibit 5, which was a second e-mail that defendant sent to her on March 13, 2007, at 3:31 a.m. In this e-mail, defendant threatened to report Stern for

insurance fraud unless she agreed to marry him. The e-mail then stated, in relevant part:

"YOU KILLED MY HEART, I WILL GET EVEN

* * *

DEAL IS ME OR YOU KNOW...TRY ME

I AM SO DESPERATE I DO NOT MIND DYING AS OF NOW

TRY ME     KILLER"

Stern testified that after receiving the second e-mail, defendant left her another phone voice mail message on March 13, 2007, at 4:09 a.m. The State introduced this voice mail message as People's Exhibit 6, in which defendant directed Stern to check her e-mail and stated, *inter alia*, "I'm dead. I'm a dead person without you and [your son]. So, I will take you with me. *** I need you with me *** in heaven, okay?"

Stern testified that defendant's voice mail messages, e-mails, and the January 27, 2007 attempted break-in made her feel "scared" and she "very much so" felt threatened. Stern testified that from defendant's voice mail messages and e-mails, she surmised that defendant took her receipts that she had submitted to her insurance company when her home had flooded and that defendant was going to claim that the receipts were fraudulent.

Stern's neighbors, Jennifer Uslais and Jim Dobrowski, testified that on February 19, 2007, at about 8:30 p.m., they heard noises in the hallway of their apartment building. Uslais testified that she saw defendant in the hallway between her apartment door and Stern's apartment door directly across the hall. Defendant told Uslais that "he wanted to talk to [her] about [her] neighbor" and asked her to come out to the hallway to talk to him. Uslais declined and told

defendant that if he did not leave, she would call the police. About an hour later, Dobrowski testified that defendant returned and Dobrowski observed him "caress" Stern's door knob and door frame. Dobrowski testified that he thought defendant was trying to break into Stern's apartment and Dobrowski directed Uslais to call the police. Dobrowski went into the hallway with his samurai sword and told defendant to leave the apartment building. Defendant responded that Stern was "doing some kind of witchcraft." Dobrowski testified that defendant finally left the building and the police arrived shortly thereafter.

Defendant testified that he met Stern through a roommate matching service and met her for coffee on two occasions. In July 2006, defendant helped Stern move into a new apartment and, about a week later, they began a sexual relationship. Defendant testified that Stern became pregnant in October 2006, but miscarried in November 2006. Defendant testified that Stern then asked him to have a vasectomy because she did not want to have any more children. Defendant testified that throughout the summer and fall of 2006, he stayed in Stern's apartment but did not have a key to the apartment. Defendant testified that he became friends with Stern's son, who is autistic, and that he had special abilities to deal with autistic children from his previous employment transporting children to special schools. Defendant testified that during this time, he gave Stern the passwords to his e-mail accounts. Defendant testified that he moved out of Stern's apartment in December 2006. Defendant acknowledged that he had a laptop computer that "was always with him" and to which Stern had no access after he moved out.

Defendant initially testified that Stern could have "manipulated" the e-mails in question, but defendant testified that he recognized the e-mails and voice mail messages that he sent Stern

on March 13, 2007. Defendant testified that he was "just depressed" at the time and that he was "being used for money." Defendant testified that his statement that he was going to kill himself and take Stern with him was "just spiritual" and "a figure of speech." Defendant testified that at the time his "heart was broken" and he had no intention of killing himself or Stern. Defendant testified that his statement that Stern killed his heart and that he would get even meant that "she would be alone." Defendant testified, "It doesn't mean to kill as you claim ***. Killing heart is a spiritual thing." Defendant testified that when he stated that he would kill "every spirit that messes with my spirit" he meant it in an emotional way but may have expressed himself the wrong way because English was not his native language. Defendant testified that his statements regarding the "insurance fraud" related to the fact that after he moved of Stern's apartment, he discovered his receipts had been reorganized into Stern's own files. As a result, defendant believed Stern was using his receipts for claims on her insurance. Defendant testified that Stern had offered to marry him on December 15, 2006 "under certain conditions" and that his message to Stern was promising "to come through as she requested." Defendant also testified that if Stern did not marry him, he threatened to turn her in for the alleged insurance fraud. Defendant testified that he was heartbroken about her breaking up with him and threatened to turn Stern in, but maintained, "I have done nothing."

During cross-examination, defendant acknowledged that he did not have a Serbian interpreter at trial and was not in fear of being misunderstood during his testimony. Defendant testified that he has been in this country for 14 years, had a construction business that was fairly successful, and also had helped children with disabilities and spoke English to them.

Following closing arguments, defendant was found guilty of cyberstalking, harassment through electronic communication, and stalking. The trial court rejected defendant's defense that his statements were not intended to be threats directed at Stern. The court found:

"[Defendant's] intent can be nothing other than that he was trying to impose his will on Ms. Stern and he says his will is he either wants her to marry him and become a family or he wants her to go to prison or he wants her dead. Those are the choices that she has.

And the fact that she doesn't want to marry him is something that angers him. *** [H]is idea of love is if I can't have you, then either I am going to kill myself and take you with me or I am going to make sure you go to prison. There's nothing in any of those communications that can be misconstrued.

The defendant wants me to believe that this is some sort of poetic license that when he says I am going to kill myself and take you with me that he is meaning something spiritual. I don't believe there's anything spiritual here. I think that the only purpose of him going on this assault, this attack during the night of March 13 was to threaten, to upset, was to intimidate, was to attack Ms. Stern.

You tried to force your way into her apartment. That was not successful. *** What you did was nothing short of trying to terrorize this woman. *** This is exactly why the cyberstalking and stalking laws were created for people like you. You wanted to terrorize her."

Defendant was subsequently sentenced to concurrent terms of three years in prison on each count. Defendant now appeals.

## II. ANALYSIS

We begin our analysis with the pertinent statute. The cyberstalking statute in effect at the time defendant was charged provided:

"(a) A person commits cyberstalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions, harasses another person through the use of electronic communication and:

(1) at any time transmits a threat of immediate or future bodily harm, sexual assault, confinement, or restraint and the threat is directed towards that person or a family member of that person, or

(2) places that person or a family member of that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint[.]

* * *

(b) As used in this Section:

'Harass' means to engage in a knowing and willful course of conduct directed at a specific person that alarms, torments, or terrorizes that person.

'Electronic communication' means any transfer of signs, signals, writings, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system. 'Electronic communication' includes transmissions by a computer through the Internet to another computer.

(c) Sentence. Cyberstalking is a Class 4 felony. A second or subsequent

1-08-0371

conviction for cyberstalking is a Class 3 felony." 720 ILCS 5/12-7.5 (West 2008). The cyberstalking statute has been amended since defendant was charged and convicted. The most recent amendment became effective January 1, 2010 (see Pub. Act 96-686, § 5, eff. Jan. 1, 2010). In this appeal, however, we are called upon to only consider the constitutionality of the statute in effect at the time defendant was charged and convicted.

### A. Overbreadth

Defendant first contends that the cyberstalking statute is unconstitutionally overbroad because it criminalizes "a substantial amount of expression, much of which is protected by the First Amendment." To demonstrate, defendant sets forth several hypothetical situations in which he contends that the statute proscribes innocent conduct, such as when a threatening e-mail is sent with both parties knowing it is a practical joke. The State responds that the statute is not overbroad where it does not proscribe constitutionally protected speech and is, thus, constitutional.

We review constitutional challenges to a statute *de novo*. People v. Greco, 204 Ill. 2d 400, 407 (2003). The doctrine of overbreadth "is designed to protect first amendment freedom of expression from laws written so broadly that the fear of punishment might discourage people from taking advantage of the freedom." People v. Bailey, 167 Ill. 2d 210, 226 (1995). The doctrine is used sparingly, and in order for a statute to be invalidated for overbreadth, its overbreadth " 'must not only be real, but substantial as well.' " Bailey, 167 Ill. 2d at 226, quoting Broadrick v. Oklahoma, 413 U.S. 601, 615, 37 L. Ed. 2d 8325, 842, 93 S. Ct. 2909, 2918 (1973).

In addressing a facial overbreadth challenge, the first task is to determine whether the

-11-

statute reaches constitutionally protected speech, as defendant contends. See Bailey, 167 Ill. 2d at 226. In viewing the cyberstalking statute, we find that defendant's facial overbreadth argument fails because the cyberstalking statute does not impinge on any constitutionally protected right of free speech.

For defendant to be convicted of cyberstalking, the State must prove that defendant "knowingly and without lawful justification" harassed the victim by transmitting "a threat of immediate or future bodily harm, sexual assault, confinement, or restraint." 720 ILCS 5/12-7.5 (West 2008). The State must also prove that defendant transmitted such a threat on at least two separate occasions. 720 ILCS 5/12-7.5 (West 2008). It is clear that the statute was intended to only punish speech performed without lawful authority.

In Bailey, our supreme court rejected the defendant's argument that the stalking statute (720 ILCS 5/12-7.3 (West 1992)) was unconstitutionally overbroad because it reached speech protected by the first amendment. Bailey, 167 Ill. 2d at 227-28. In Bailey, the stalking statute at issue provided:

"(a) A person commits stalking when he or she transmits to another person a threat with the intent to place that person in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint, and in furtherance of the threat knowingly does any one or more of the following acts on at least 2 separate occasions:

(1) follows the person, other than within the residence of the defendant;

(2) places the person under surveillance by remaining present outside his or her school, place of employment, vehicle, other place occupied by the person, or

residence other than the residence of the defendant." 720 ILCS 5/12-7.3 (West 1992).

In upholding the statute, our supreme court explained, "For defendant to be convicted of stalking, the State must prove that defendant threatened the victim 'with the intent to place that person in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint.' In furtherance of the threat, the State must also prove that defendant followed the victim or placed the victim under surveillance on at least two separate occasions. Moreover, as previously explained, the statute was intended to only punish that conduct performed without lawful authority." Bailey, 167 Ill. 2d at 226-27. Our supreme court noted that while the offense of stalking contained an element of speech, that speech was not constitutionally protected. The court explained, " 'Where speech is an integral part of unlawful conduct, it has no constitutional protection.' " Bailey, 167 Ill. 2d at 227, quoting Chicago Real Estate Board v. City of Chicago, 36 Ill. 2d 530, 552-53 (1967).

Here, defendant argues that, unlike the stalking statute in Bailey, the cyberstalking statute does not require any overt action such as following the victim or placing the victim under surveillance in addition to a threat. As a result, defendant maintains that the cyberstalking statute criminalizes speech alone and is thus unconstitutionally overbroad.

However, defendant misunderstands our supreme court's analysis in Bailey. In Bailey, our supreme court did not hold that a physical act in addition to a threat was a prerequisite to survive an overbreadth challenge. Rather, the court explained:

"The element of a threat in the stalking statute is an integral part of the offense. The

-13-

offense cannot be committed without the initiation of the threat because the following and surveillance requirements can only be met after a threat has been made. We therefore conclude that the element of speech in the stalking statute is not constitutionally protected. Moreover, because the statute only encompasses activities performed without lawful authority, we find that it does not implicate any other constitutionally protected activity." Bailey, 167 Ill. 2d at 227-28.

In this case, the element of a threat is also an integral part of the offense of cyberstalking. Therefore, the element of speech in the cyberstalking statute, the threat, does not fall within the protections of the first amendment. In addition, our supreme court noted that the legislature's intent in enacting statutes, such as the stalking statute, was "to prevent violent attacks by allowing the police to act before the victim was actually injured and to prevent the terror produced by harassing actions." Bailey, 167 Ill. 2d at 224. Our supreme court explained, "By construing the statutes to proscribe only conduct performed 'without lawful authority,' the possibility that the statutes reach innocent conduct is also avoided. Bailey, 167 Ill. 2d at 224-25.

Further, defendant's hypothetical scenarios, *i.e.* a threatening e-mail sent as a practical joke or common hyperbole, are not reasonable demonstrations of constitutionally protected conduct punishable by the statute. The punishable behavior is narrowed by the elements of the cyberstalking statute, such that the defendant must "knowingly and without lawful justification" specifically intend to "haras[s]" the victim by transmitting the threat. 720 ILCS 5/12-7.5 (West 2008). Accordingly, no first amendment concerns are at issue here and the statute is not void for overbreadth.

1-08-0371

Defendant, nonetheless, argues that the cyberstalking statute as applied to this case violated his right to free speech because he did not intend his statements to be "true threats," which are excluded from first amendment protection. The State correctly notes that defendant's "as applied" argument does not present a viable facial challenge that would result in the wholesale striking of the cyberstalking statute as unconstitutional. Rather, if defendant were to establish that his statements did not constitute true "threats" within the meaning of the statute, the appropriate remedy would be to vacate his sentence and conviction for cyberstalking. See Watts v. United States, 394 U.S. 705, 708, 22 L. Ed. 2d 664, 667, 89 S. Ct. 1399, 1401 (1969) (statute prohibiting threats against President of the United States was constitutional on its face; however, the defendant's political hyperbole did not fit within the statutory term "true threat" and the defendant was to be acquitted).

Defendant relies on Virginia v. Black, 538 U.S. 343, 359-60, 155 L. Ed. 2d 535, 552, 123 S. Ct. 1536, 1548 (2003), in support of his argument that a subjective approach should be applied to determine whether his statements amounted to "true threats."

In Black, the United States Supreme Court considered the constitutionality of a Virginia statute making it a criminal offense to burn a cross with intent to intimidate. The Court invalidated the statute on first amendment grounds, but the justices were divided on the rationale. Black, 538 U.S. at 336-67, 155 L. Ed. 2d at 556-57, 123 S. Ct. at 1551-52. For our purposes, here, the plurality noted that the first amendment does not preclude restrictions on certain categories of speech having little or no social value, and threats are one such category. The plurality offered a new definition of true threats:

-15-

1-08-0371

> " 'True threats' encompass those statements where the speaker means to
> communicate a serious expression of an intent to commit an act of unlawful
> violence to a particular individual or group of individuals. [Citations.] The speaker
> need not actually intend to carry out the threat. Rather, a prohibition on true
> threats 'protects individuals from the fear of violence' and 'from the disruption
> that fear engenders,' in addition to protecting people 'from the possibility that the
> threatened violence will occur.' [Citation.] Intimidation in the constitutionally
> proscribable sense of the word is a type of true threat, where a speaker directs a
> threat to a person or group of persons with the intent of placing the victim in fear
> of bodily harm or death." Black, 538 U.S. at 359-60, 155 L. Ed. 2d at 551-52,
> 123 S. Ct. at 1548.

Defendant notes that some federal courts have held that a "statement qualifies as a true threat only
if the speaker subjectively intended it as a threat." United States v. Parr, 545 F.3d 491, 499 (7th
Cir. 2008), citing United States v. Magleby, 420 F.3d 1136 (10th Cir. 2005), United States v.
Cassel, 408 F.3d 622, 631 (9th Cir. 2005). However, not all courts have agreed that Black
changed the test for true threats. See, e.g., Porter v. Ascension Parish School Board, 393 F.3d
608, 616 (5th Cir. 2004) (interpreting Black to require only that the speaker knowingly made the
statement, not subjectively intended it as a threat).

This court has previously found that the term "threat" implies that the threatening
expression has " 'a reasonable tendency to create apprehension that its originator will act
according to its tenor.' " People v. Zamudio, 293 Ill. App. 3d 976, 983 (1997), quoting, People v.

-16-

Maldonado, 247 Ill. App. 3d 149, 153-54 (1993). However, this court need not resolve whether the Supreme Court in Black intended to add a subjective intent requirement to the test for true threats in order to address the constitutionality of the cyberstalking statute. As previously discussed, the statute was intended to only punish conduct performed "knowingly and without lawful justification." 720 ILCS 5/12-7.5 (West 2008). The State must prove that defendant engaged in such conduct or speech that was not constitutionally protected. As discussed later in addressing defendant's challenge to the sufficiency of the evidence, defendant placed his subjective intent at issue by arguing that his statements were merely "spiritual" in nature rather than threats. The trial court, as trier of fact, rejected defendant's argument and determined that his statements were clear threats directed at the victim. Moreover, while defendant asserts that he did not intend to actually harm the victim, the Supreme Court explained in Black, defendant "need not actually intend to carry out the threat." Black, 538 U.S. at 359-60, 155 L. Ed. 2d at 551-52, 123 S. Ct. at 1548. Defendant's statements in this case clearly fit within the "true threat" requirement of the cyberstalking statute.

## B. Vagueness

Defendant additionally argues that the cyberstalking statute is unconstitutionally vague on its face. "[A] statute is void for vagueness if it reaches a substantial amount of constitutionally protected conduct." City of Chicago v. Pooh Bah Enterprises, Inc., 224 Ill. 2d 390, 442 (2006). To prevail on a vagueness challenge, the challenger must demonstrate that: (1) a person of ordinary intelligence would not have a reasonable opportunity to understand what conduct the statute prohibits; or (2) the statute authorizes or encourages arbitrary enforcement. Hill v.

1-08-0371

Colorado, 530 U.S. 703, 732, 147 L. Ed. 2d 597, 621, 120 S. Ct. 2480, 2498 (2000).

We find that defendant failed to demonstrate that the cyberstalking statute is vague. Because the analyses for facial overbreadth and vagueness challenges are akin and we previously determined in his overbreadth challenge that defendant failed to demonstrate that the cyberstalking statute punished a substantial amount of protected speech, defendant also cannot present a successful vagueness argument. See People v. Butler, 375 Ill. App. 3d 269, 273 (2007) (holding the Illinois witness harassment statute was not unconstitutionally overbroad or vague on its face).

Nevertheless, we also find that defendant cannot demonstrate that the cyberstalking statute fails to provide citizens with adequate notice or leads to arbitrary enforcement. Specifically, defendant asserts that citizens are not apprised of the prohibited conduct and arbitrary enforcement results where the legislature did not precisely define a standard by which to judge "emotional distress" or "mental anguish" caused by a statement that "alarms, torments, or terrorizes" the victim. See 720 ILCS 5/12-7.5 (West 2008). Defendant relies on Coates v. City of Cincinnati, 402 U.S. 611, 29 L. Ed. 2d 214, 91 S. Ct. 1686 (1971), in support of his argument. However, the present case is distinguishable.

In Coates, the United States Supreme Court held that a statute criminalizing situations where three or more people annoyed any police officer or passerby while standing on a sidewalk or street corner was unconstitutionally vague because the proscribed conduct, annoying an officer or passerby, without more amounted to "no standard of conduct *** specified at all." Coates, 402 U.S. at 614, 29 L. Ed. 2d at 217, 91 S. Ct. at 1688. In contrast, the scope of punishable

-18-

1-08-0371

conduct under the instant statute is limited by the individual's specified intent to "haras[s]" by communicating a "threat" so as to "engage in a knowing and willful course of conduct" directed at the victim that "alarms, torments, or terrorizes" the victim. See 720 ILCS 5/12-7.5 (West 2008). While the legislature framed the prohibited result in general terms of causing alarm, torment or terror, it is well settled that " ' "[i]mpossible standards of specificity *** are not required." ' " Butler, 375 Ill. App. 3d at 274, quoting People v. Parkins, 77 Ill. 2d 253, 256 (1979), quoting People v. Schwartz, 64 Ill. 2d 275, 280 (1976). We determine that application of the ordinary meaning of the statutory language and recognition of the evil the statute intends to prevent, *i.e.*, to prevent violent attacks by allowing the police to act before the victim is actually injured and to prevent the terror produced by harassing actions (see Bailey, 167 Ill. 2d at 224), provides adequate notice and prevents arbitrary enforcement. See Butler, 375 Ill. App. 3d at 274. Accordingly, we conclude that the cyberstalking statute is not unconstitutionally vague on its face.

C. One-Act, One-Crime Rule

Defendant next argues that this court should vacate his conviction for harassment through electronic communication where that conviction was based on the same act used to support his conviction for cyberstalking, in violation of the one-act, one-crime rule announced in People v. King, 66 Ill. 2d 551 (1977).

In King, the supreme court stated:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are,

-19-

by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." King, 66 Ill. 2d at 566.

The King case was reaffirmed and clarified by our supreme court in People v. Rodriguez, 169 Ill. 2d 183 (1996). In Rodriguez, the court noted that, under King, a court first must determine whether a defendant's conduct consists of one act or several acts. Multiple convictions are improper if they are based on precisely the same physical act. If the defendant's conduct is based on more than one physical act, a court must then determine whether any of the offenses are lesser-included offenses. If they are, then multiple convictions are improper. Rodriguez, 169 Ill. 2d at 186. The court held that convictions for both aggravated criminal sexual assault and home invasion were proper where the defendant committed multiple acts, despite the interrelationship of those acts. Rodriguez, 169 Ill. 2d at 189.

In People v. Artis, 232 Ill. 2d 156, 168 (2009), our supreme court held that it would not abandon the one-act, one-crime rule announced in King. In so doing, the court noted that it has found a one-act, one-crime violation to qualify for review under the second prong of the plain-error rule. Artis, 232 Ill. 2d at 165-66. The court explained:

"Under that portion of the rule, a court may disregard forfeiture where a clear or obvious

error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. [Citation.] The second prong of the plain-error rule is 'invoked only in those exceptional circumstances where, despite the absence of objection, application of the rule is necessary to preserve the integrity and reputation of the judicial process.' " Artis, 232 Ill. 2d at 165-66, quoting People v. Harvey, 211 Ill. 2d 368, 387 (2004).

Recently, in People v. Nunez, No. 108189, slip op. at 4 (March 18, 2010), our supreme court, citing Artis, held that "forfeited one-act, one-crime arguments are properly reviewed under the second prong of the plain-error rule because they implicate the integrity of the judicial process."

Accordingly, while defendant in this case forfeited his one-act, one-crime argument for review by failing to object or include the issue in a posttrial motion, we will consider defendant's argument under the plain-error rule.

Defendant was charged and convicted of cyberstalking (720 ILCS 5/12-7.5(a)(1) (West 2008)), a Class 3 offense, based on two e-mails sent to the victim on March 13, 2007, containing the threats "that he will kill himself and take her with him" and "that the victim killed his heart and he will get even." Defendant was also charged and convicted of harassment through electronic communication (720 ILCS 135/1-2(a)(4) (West 2008)), a Class 4 offense, based on the e-mail sent to the victim containing the threat "that he will kill himself and take her with him." There is no separate act in this case. In one instance the e-mail threatening to "kill himself and take [the victim] with him" is combined with a second e-mail to constitute cyberstalking, and in the other it

is the same e-mail threatening to "kill himself and take [the victim] with him" to create a separate offense of harassment through electronic communication. We hold that the one-act, one-crime rule applies to these convictions. Therefore, the separate conviction for harassment through electronic communication is reversed and the sentence vacated.

### D. Sufficiency of the Evidence

Defendant also argues that the State failed to prove him guilty of cyberstalking and stalking beyond a reasonable doubt.[2]

When reviewing the sufficiency of the evidence, this court must determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)' [Citations.]" People v. Cardamone, 232 Ill. 2d 504, 511 (2009). It is not this court's function to retry the defendant or substitute our judgment for that of the trier of fact. People v. Evans, 209 Ill. 2d 194, 211 (2004). Rather, the trier of fact assesses the credibility of the witnesses, determines the appropriate weight of the testimony and resolves conflicts or inconsistencies in the evidence. Evans, 209 Ill. 2d at 211. In order to overturn the trial court's judgment, the evidence must be so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's guilt. People v. Graham, 392 Ill. App. 3d 1001, 1009 (2009).

To be convicted of cyberstalking, the State must prove that the defendant, on at least two

---

[2]Because we vacate defendant's conviction and sentence for harassment through electronic communication as violative of the one-act, one-crime rule, we need not consider defendant's sufficiency of the evidence argument with respect to that offense.

separate occasions, harassed the victim through the use of electronic communication by transmitting "a threat of immediate or future bodily harm." The cyberstalking statute defines harassment as a "knowing and willful course of conduct" that "alarms, torments, or terrorizes" the victim. 720 ILCS 5/12-7.5 (West 2008). Defendant contends that the State failed to prove that defendant's statements included two instances of threats of either future or immediate bodily harm and that the victim was alarmed, tormented, or terrorized where she did not immediately call police after receiving the e-mails from defendant.

Viewing the evidence in the light most favorable to the State, we find that the State satisfied its burden. The evidence at trial established that on March 13, 2007 at 1:57 a.m., defendant sent the victim an e-mail in which, *inter alia*, defendant stated "I will commit suicide, my life will vanish or I will do suicide and I will take you with me." Defendant sent the victim a second e-mail at 3:31 a.m., stating, "You killed my heart, I will get even," "I am so desperate I do not mind dying as of now," "Try me." The e-mail ended with the word "Killer." The State also presented evidence that defendant left the victim several voice mail phone messages in which defendant, *inter alia*, directed the victim to check her e-mail and stated, "I'm dead. I'm a dead person without you and [your son]. So, I will take you with me. *** I need you with me *** in heaven, okay?" The victim also testified that defendant attempted to break into her apartment on January 27, 2007. The victim's neighbors testified that on the evening of February 19, 2007, they observed defendant in the hallway of the victim's apartment building and saw defendant caressing the door. The victim's neighbors testified that they asked defendant to leave the building two separate times and called police. The victim testified on that date, February 19, 2007, the air was

1-08-0371

let out of her car's tires and she received voice mail phone messages from the defendant acknowledging that he flattened her tires. The victim further testified that defendant's voice mail messages, e-mails, and the January 27, 2007 attempted break-in made her feel scared and threatened. While defendant argues that his e-mails referred to threatening to report the victim for insurance fraud which did not amount to physical harm, defendant's e-mails also contained statements indicating that he would cause the victim bodily harm. In this context, the trial court assessed the credibility of the witnesses and rejected defendant's testimony that his statements were merely spiritual in nature. We find that the evidence was not so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's guilt of cyberstalking. Graham, 392 Ill. App. 3d at 1009 (2009).

Defendant also contends that the evidence was insufficient to support his conviction for stalking where the State failed to prove that defendant on two separate occasions placed the victim "under surveillance."

The stalking statute in effect at the time, provided as follows:

"(a) A person commits stalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions follows another person or places the person under surveillance or any combination thereof and:

(1) at any time transmits a threat to that person of immediate or future bodily harm, sexual assault, confinement or restraint; or

(2) places that person in reasonable apprehension of immediate of future bodily harm, sexual assault, confinement or restraint." 720 ILCS 5/12-7.3(a)(1),(a)(2) (West

1-08-0371

2008).

The statute also specifies that one "places a person under surveillance" by "remaining present outside the person's school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant." 720 ILCS 5/12-7.3(d) (West 2008).

Defendant argues that his actions on January 27, 2007, and February 19, 2007, did not constitute placing Stern "under surveillance" because he did not "remain present" outside her residence. Defendant maintains that he merely went to Stern's residence, where he formerly resided, and that there was no evidence that the victim was inside of her residence on February 19, 2007.

This court considered a similar argument in People v. Daniel, 283 Ill. App. 3d 1003 (1996). In Daniel, the defendant challenged his aggravated stalking conviction, contending that he did not remain present outside the victim's place of employment. Daniel, 283 Ill. App. 3d at 1005-06. The evidence revealed that the defendant entered the victim's workplace, threatened her, threatened to damage her vehicle, and ranted for approximately 15 minutes. After he left the building where the victim worked, the defendant crossed the street, walked to the rear of the victim's car, hit the window, and then departed. Daniel, 283 Ill. App. 3d at 1004. This court found two distinct bases to uphold the defendant's conviction based on the defendant's actions both inside and outside the victim's place of employment. Daniel, 283 Ill. App. 3d at 1006. This court held that the defendant violated the stalking statute by " 'remaining outside' the [victim's place of employment]--even for a brief period–because of the nature of his actions, actions that

-25-

the stalking statute was designed to prohibit and that established that he was no mere passerby." Daniel, 283 Ill. App. 3d at 1006 n.1. This court explained:

> "We discern no statutory intent to set a minimum amount of time a defendant must remain in the vicinity of his victim's building before coming within the ambit of the stalking statute. Thus, although 'remain' has a temporal connotation, there is no basis for concluding that a defendant must stop, stay, or wait for a set period of time before his behavior is deemed to be surveillance under the stalking statute." Daniel, 283 Ill. App. 3d at 1008.

This court further stated, "Although this is not the paradigmatic case where a stalker lies in wait for his victim, there is no basis for concluding that the legislature meant to exempt this sort of conduct from the stalking statute." Daniel, 283 Ill. App. 3d at 1009.

The holding in Daniel was followed and further explained by this court in People v. Curtis, 354 Ill. App. 3d 312 (2004). In Curtis, this court found that the evidence was sufficient to show that the defendant placed the victim "under surveillance," as required for aggravated stalking. The defendant had called the victim and warned her that when he returned to jail it would be for something more serious, went to the victim's house, called and threatened to kill the victim if she did not let him see their child. The defendant told the victim that he would return her leather jackets that he stole from her house if she let him see their child and dictated a time and place to meet. At the meeting, the defendant waved at the victim, walked toward her car and motioned for her to come to him, but defendant did not have the leather jackets. Curtis, 354 Ill. App. 3d at 319-20. This court followed the holding in Daniel that "there was no minimum period of time

that defendant was required to remain present outside [the victim's] car or that he was required to stop, stay or wait for a set period of time outside the car in order for his actions to constitute surveillance." Curtis, 354 Ill. App. 3d at 318. This court again explained that the stalking statute encompasses more than incidents in which a stalker laid in wait for his victim. This court explained, "The legislature enacted this statute to prevent violent attacks on victims by prohibiting the conduct that precedes them and by allowing the police to act before the victim is actually injured." Curtis, 354 Ill. App. 3d at 319.

We agree with Daniel and Curtis and conclude that there was no minimum period of time that defendant was required to remain present outside the victim's apartment on January 27, 2007, or February 19, 2007. Additionally, defendant's conduct was not the sort of innocent behavior of a mere visitor as he suggests. Rather, the evidence showed that on January 27, 2007, defendant attempted to break into the victim's apartment through her back door and yelled obscenities at her. On February 19, 2007, the victim's neighbors observed defendant on two separate occasions in the hallway outside of the victim's apartment. The victim's neighbors testified that defendant caressed the victim's door and would not leave until they told him they were calling the police. As to defendant's argument that the State failed to prove that the victim was inside her residence on February 19, 2007, we find this to be immaterial. Section 12-7.3(d) provides that one "places a person under surveillance" by "remaining present outside the person's school, place of employment, vehicle, *other place occupied by the person*, or residence other than the residence of the defendant." (Emphasis added.) 720 ILCS 5/12-7.3(d) (West 2008). A plain reading of the phrase "occupied by the person" demonstrates that it applies only to the words

preceding it - "other place." It is not applicable to the victim's school, place of employment, vehicle or residence. Therefore, we will not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. See People v. Cardamone, 232 Ill. 2d 504, 516 (2009).

Defendant further argues that the State failed to prove that defendant placed the victim in "reasonable apprehension of immediate or future bodily harm, ***, confinement, or restraint" pursuant to section 12-7.3(a)(2) of the stalking statute (720 ILCS 5/12-7.3(a)(2) (West 2008)). However, the record shows that defendant was charged with stalking pursuant to section 12-7.3(a)(1) of the statute, which requires the State to show that the defendant "at any time transmit[ted] a threat of immediate or future bodily harm." 720 ILCS 5/12-7.3(a)(1) (West 2008). The evidence at trial showed that defendant left the victim several voice mail phone messages threatening to kill her. Accordingly, defendant's argument is without merit.

## E. Krankel Inquiry

Defendant next contends that the circuit court failed to conduct any inquiry into his *pro se* allegations of ineffective assistance of trial counsel, as required by People v. Krankel, 102 Ill. 2d 181 (1984). Defendant requests that the matter be remanded to the circuit court for an inquiry into defendant's ineffective assistance claims.

In Krankel, the defendant's trial counsel did not contact an alibi witness or present an affirmative alibi defense at trial. The defendant raised a *pro se* posttrial challenge to his attorney's competence at trial. Our supreme court held that the trial court should have appointed alternative counsel to represent the defendant at the posttrial hearing regarding his claim of ineffective

assistance of trial counsel. The court remanded the matter for a new hearing on the defendant's motion with newly appointed counsel. Krankel, 102 Ill. 2d at 187-89.

In People v. Moore, 207 Ill. 2d 68 (2003), our supreme court further explained the procedures that trial courts should use to resolve *pro se* claims of ineffectiveness of counsel. The trial court is not required to automatically appoint new counsel in every case; rather, the trial court should evaluate the factual basis of the defendant's claim. Moore, 207 Ill. 2d at 77-78. The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel. Moore, 207 Ill. 2d at 78. This inquiry can be accomplished in several ways. The trial court could simply ask the trial counsel about the circumstances surrounding the claim or ask defendant questions about his claim. Moore, 207 Ill. 2d at 78. Alternatively, the trial court can base its determination on its personal knowledge of defense counsel's performance at trial or on the facial insufficiency of defendant's allegations. Moore, 207 Ill. 2d at 79. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. Moore, 207 Ill. 2d at 78. However, if the allegations show possible neglect of the case, new counsel should be appointed. Moore, 207 Ill. 2d at 78.

Defendant first argues that the circuit court should have conducted an inquiry into defendant's pretrial claims, where "on almost every pretrial date, [defendant] sought to speak with the trial court or otherwise objected." The State responds that Krankel is inapplicable to pretrial claims and the trial court satisfied any required inquiry into defendant's *pro se* claims of ineffective assistance of trial counsel.

The record shows that defendant made repeated interruptions during court proceedings. For example, on the second pretrial date, September 27, 2007, the circuit court continued the matter and defendant stated, "Judge, I want *pro se*." On October 31, 2007, defendant interrupted proceedings and stated that his trial attorney was "defective" in her failure to advise him of the "penalties in case of rejecting" an offer. The circuit court explained:

> "Well, you understand, sir, it's up to the Judge to determine what the appropriate sentence is. Even if your attorney reaches an agreement with the State, I would still have to go along with that. I know nothing about your case, I know nothing about your background.
>
> Whether of not I would even go along with an agreement, that's speculation."

Defendant responded, "If I did not reject it, I would have been free on September 11 at the latest." The court then explained, "What if I didn't go along with it? I could have said no." Even if the trial court was required to inquire into defendant's pretrial claims under Krankel, the record shows that the court considered defendant's allegation and determined that it was speculative and, therefore insufficient. The trial court was permitted to base its determination on the facial insufficiency of defendant's allegations. Moore, 207 Ill. 2d at 79.

Defendant filed a *pro se* motion to dismiss his indictment alleging a speedy trial violation and that trial counsel "ignored [his] discovery" and was an "accessory" to the fact that "[t]he whole case is false and intend[ed] to prevent defendant [from] hand[ing] over complain[ing] witness to federal prosecution for forging [her] insurance claim." We note that defendant testified at trial regarding this "defense."

Defendant also filed a *pro se* motion for new trial alleging, *inter alia*, that trial counsel

"misl[ed] [him] about discovery and test[imony]," was "ineffective [in] examining witnesses, refusing to place *** questions she was given," "stipulated to improper evidences [sic] presented" and "counsel had a conflict of interest." The only stipulations entered into in the instant case were in regards to the identity of the e-mail accounts from which the e-mails at issue were sent and received, and the translation of the content of the e-mails which were partially in Serbian. Defendant himself testified as to the contents of the e-mails, acknowledging that he had sent them to the victim and that the translation was correct.

During defendant's sentencing hearing, the circuit court stated, "I've read your motion for a new trial." Also, during the sentencing hearing defendant explained his argument that the State had delayed his trial and trial counsel was ineffective in representing him with respect to a proposed plea agreement. Defendant stated:

> "And the second thing is that plea negotiations *** the State should never have engaged in pulling my mind such that they did in November.
>
> I had a visit in the jail offer [sic] that they would leave for November the 29th and then denied. And it's obvious confirmation of playing games in regards to stalling case."

Defendant's trial counsel addressed defendant's argument and stated:

> "When [defendant] said that he had been offered misdemeanor probation, I would say that that is correct.
>
> He was offered a misdemeanor back in, I believe it was April. And then later on, in November, it was apparently a misunderstanding or a miscommunication between me and [the prosecutor]. But, I was led to at least interpret the States's offer as one of

-31-

misdemeanor.

> So, I went to the jail and talked to [defendant] about a misdemeanor and he was prepared to plead to that. And that is what he's referring to. And he was understandably upset when that possibility was taken away."

The record therefore shows that trial counsel addressed defendant's claims. Any inquiry required by the trial court into defendant's *pro se* claims was satisfied by trial counsel explaining the circumstances surrounding the claim. See Moore, 207 Ill. 2d at 78.

### III. CONCLUSION

For the above reasons, we vacate defendant's conviction and sentence for harassment through electronic communication as violative of the one-act, one-crime rule and affirm the judgment of the circuit court with respect to defendant's convictions and sentences for cyberstalking and stalking.

Vacated in part and affirmed in part.

STEELE and COLEMAN, JJ., concur.