# Illinois Official Reports

## Appellate Court

---

### *People v. Diomedes*, 2014 IL App (2d) 121080

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL T. DIOMEDES, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-1080 |
| Filed | June 16, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for disorderly conduct based on sending an e-mail with a threat of violence to the dean of the high school defendant attended, the appellate court held that the circumstantial evidence established that defendant wrote the e-mail, that the admission of the e-mail into evidence was not an abuse of discretion, that a rational trier of fact could have found beyond a reasonable doubt that the e-mail threatening violence, death or bodily harm was knowingly sent to the dean, and defendant's claim that the e-mail was merely "an expression of teenage despair," not a "true threat," was rejected where defendant made a prior threat on Facebook that resulted in his expulsion from high school, the e-mail in the instant case was sent to one specific recipient, the tenor was serious, it did not contain any jest, hyperbole or political dissent, it did contain complaints about defendant's "needs" and that he wanted the dean dead, and under the circumstances, a reasonable sender would foresee that a reasonable recipient would view the e-mail as a serious threat. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 11-CF-858; the Hon. James C. Hallock, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Alan D. Goldberg and Kathleen Weck, both of State Appellate Defender's Office, of Chicago, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Matthew J. Schmidt, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Zenoff and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1 After a bench trial, defendant, Daniel T. Diomedes, was convicted of disorderly conduct for knowingly transmitting by e-mail a threat of violence directed against a high school dean. 720 ILCS 5/26-1(a)(13) (West 2010).[1] On September 27, 2012, the court sentenced defendant to 30 months of probation and 365 days of electronic home monitoring. On appeal, defendant argues that we must reverse his conviction because the evidence was insufficient to establish that he knowingly transmitted a threat and because the e-mail forming the basis of his conviction was not authenticated at trial. In addition, defendant argues that, even if the e-mail contained a threat, it was not a "true threat" and, therefore, his speech was protected by the first amendment of the United States Constitution. U.S. Const., amend. I. For the following reasons, we affirm.

¶ 2 I. BACKGROUND

¶ 3 On August 8, 2011, defendant was indicted for knowingly transmitting a threat of violence directed against Susan Shrader, a dean at Geneva High School, in that he transmitted an e-mail message containing a death threat in violation of section 26-1(a)(13) of the Criminal Code of 1961 (720 ILCS 5/26-1(a)(13) (West 2010)). Defendant's motion to reduce bond was granted with numerous conditions, including that he routinely visit a psychiatrist and take his prescribed medication. Further, defendant moved to quash his arrest and suppress evidence on the basis that there was no probable cause for the arrest. The trial court, specifically Judge James C. Hallock, denied the motion.[2]

---

[1]The statute has since been amended and renumbered such that section 26-1(a)(13) is now section 26-1(a)(3.5). See Pub. Act 97-1108, § 10-5 (eff. Jan. 1, 2013). Nevertheless, we refer herein to section 26-1(a)(13), as it is the section under which defendant was convicted.

[2]We note for context only that, at the hearing on his motion to quash and suppress, defendant testified that, on April 26, 2011, at 1:30 a.m., he wrote an e-mail to Jodee Blanco from his mother's computer. He identified the e-mail, and it was introduced into evidence. Portions of the e-mail read into evidence are identical to the e-mail presented at trial. The parties did not, however, stipulate that evidence presented at the suppression hearing was admissible at trial.

¶ 4		Judge Hallock also presided over defendant's bench trial, which commenced on May 24, 2012. Defendant was age 19 at the time of trial (age 18 at the time of the alleged offense). The State's first witness was Jodee Blanco, who testified that she is an anti-bullying activist and author who travels to schools around the world, sharing her personal story of bullying survival with the goal of motivating change. Blanco is not a trained counselor or psychologist.

¶ 5		Prior to April 26, 2011, Blanco presented her anti-bullying program at Geneva High School. After the program, defendant and other students approached her. Blanco has an "activist e-mail" address, "jodee@jodeeblanco.com," that she provides to students and readers. The e-mail address links to her website, which is monitored by Blanco's staff. The staff is trained to handle the communications, but, when there are e-mails of particular urgency, the staff contacts Blanco. On April 26, 2011, Blanco was in New Orleans to give a convention address. Her staff called about "a disconcerting e-mail" and read it to her over the phone. Blanco told the staff to "immediately" forward the e-mail to her, and, once she received it, she read it on her iPhone. The State showed Blanco exhibit No. 1, which she identified as "the e-mail that was sent to me at my activist address from [defendant] that concerned my staff." The trial court sustained defendant's objection for lack of foundation. The State then asked Blanco if the exhibit reflected the e-mail she received in April 2011, and she replied, "Oh, yes, that's the one," and confirmed that it was "exactly same." The State moved to admit the e-mail, but the court sustained defendant's hearsay objection. Ultimately, the State again showed Blanco the exhibit and asked her what e-mail address the e-mail was sent to; she confirmed that it was sent to her activist e-mail address, which she provides to "anyone who needs to reach out to [her]." Blanco confirmed that the e-mail was in the same form as when she received it on April 26, 2011. Defendant objected on the bases of lack of foundation, the best-evidence rule, and hearsay. The court ruled, "at this time, it is admitted. It's admissible. I think what you are saying goes more to the weight, so it's admitted over objection."

¶ 6		Exhibit No. 1 reflects that it is "From: dan daman." The "sent" line reflects "Sent: Tuesday, April 26, 2011 1:37 a.m." The subject line reflects "Subject: Hey Jodee, this is Dan Diomedes from Geneva." The email is sent to "jodee@jodeeblanco.com" and copies "thetetrisking@yahoo.com." The e-mail states:

> "Hi Jodee, It's been awhile, I can't believe it's been this long, but I can't take it anymore, I wanna die. There was something I never told you in the last e[-]mail I sent you. I was expelled from Geneva High School for posting a threat on my Facebook. Some girl that use [*sic*] to be my friend called the cops on me. I wasn't gonna do anything, I just wanted someone to care. The cops took my computer, and I've been in the alternative school since April of last year. I've made friends with the other kids who are bullied there, nobody messes with me because I'm not afraid of anything. A lot of progress between kids has increased, and my teachers say they view me as a leader. But, I can't do it, my family is useless low life shit, my teachers don't help me, they just tell me how to live with it. I'm talking about being in this alternative school. I was raised by low life people, then I AM THE ONE WHO HAS TO END UP IN A SPECIAL SCHOOL? NOT ONLY THAT, THE DEAN AT GENEVA NEVER DID ANYTHING WHEN I TOLD HER HOW KIDS TRIED TO HIT ME WITH THEIR CARS, THEY THREW SHIT AT ME, AND SHOT ME WITH

- 3 -

AIRSOFT GUNS, WHICH LEFT MARKS ON MY FACE. I'm so well[-]behaved at this alternative school, that they tried to get me out, which RARELY happens, so it was a big deal, Geneva said they didn't want me back. I can't take this alternative school environment, I can't stand having to empty my pockets every morning, I can't stand being escorted every time I have to go to the bathroom or something like that. They have time[-]out rooms, mostly everyone at the school has been [in] them. I've been there a year, and never once have I had to go in one. I want out or I will die, the place is suffocating me. I NEED a regular school environment. I was in the counselor's office the other day because I was writing suicide notes, a will, and who I was going to kill. I planned not to hurt any kids, I just want the dean at Geneva, my grandparents, and my mother dead. I'm the one who has suffered my whole life, now I want them to suffer." (Emphases in original.)

¶ 7    Blanco testified that, when she read the e-mail, she felt "[c]oncern for the safety of [defendant's] grandparents, his mother and the dean; compassionate, compassionate concern for [defendant] because the demeanor of the e-mail led [her] to believe that he was troubled and needed support." After reading the e-mail, Blanco instructed her staff to telephone the principal at Geneva High School and to link Blanco into the conversation. She spoke to the principal "in the hopes that he would have the address of [defendant's] family so they could be alerted to get out of the house." Next, Blanco was linked into a phone call with the police, and she asked them to dispatch units to defendant's residence and to Mades-Johnstone Center in St. Charles, the alternative high school where defendant was a student. Finally, Blanco contacted Mades-Johnstone.

¶ 8    Blanco testified that, although she is not a trained psychologist, she follows guidelines to protect herself from potential liability. Accordingly, when the principal of Mades-Johnstone had defendant and the police in his office, Blanco told the police that she was concerned about defendant and she asked that he be taken to a hospital where he could be observed and kept from hurting himself or others. She also spoke with the principal and with defendant, who was "sad, frightened, resolved." According to Blanco, in that conversation, defendant threatened his mother and grandparents. She asked defendant if he understood that many lives, including his own, would change if he killed his mother and grandparents and if he "underst[ood] the finality of what that would mean." Defendant responded, "yes."

¶ 9    The State next called Ginger Rohde, one of defendant's teachers at Mades-Johnstone. Rohde testified that, on or about April 26, 2011, defendant was working at a computer station. Rohde approached defendant to tell him that "somebody had come for him," and she saw at his station a folder that he used in the classroom. She took the folder and gave it to the police on April 26, 2011. The folder was introduced as exhibit No. 2. Rohde identified it and briefly described it as containing "some writings that were made that talked about a will, things that would be given away. It talked about kids suffering. It talked about [defendant] not belonging at our school, feeling that he didn't belong as one of our students. Talking about getting out." Over defendant's relevance objection, the exhibit was admitted into evidence.[3]

_____

[3]It is unclear whether this folder contains the will and list that, according to the e-mail, caused defendant to be sent to the counselor's office. In any event, this court has reviewed the folder. On its front cover, it states, "I need to get out of Mades," "I shouldn't fucking be there in the fucking first

¶ 10    Finally, Detective Brad Jerdee testified that he is the high school liaison officer responsible for monitoring criminal activities in the area high schools. On April 26, 2011, Jerdee learned of an e-mail that had been forwarded to Geneva High School by Blanco. When asked if he knew who sent the e-mail to Blanco, Jerdee replied that it was defendant. Defendant objected, arguing that there was no proof who wrote the e-mail; the court overruled defendant's objection. Jerdee continued that there were, at that time, three deans at Geneva High School: Mike Kelly, Reed Allison, and Susan Shrader. Jerdee identified exhibit No. 1 as the e-mail that defendant wrote to Blanco and that was forwarded to Jerdee's attention. (Defendant's objections were again overruled.) After reviewing the e-mail, Jerdee advised Shrader of the "threat in the e-mail" and notified Mades-Johnstone of the "severe threat" received. Jerdee observed Shrader's demeanor after she read the e-mail. She was visibly upset, nervous, "shaky," uneasy, and fearful. Jerdee testified that defendant was formerly a student at Geneva High School, but had been "outplaced" (*i.e.*, expelled) to Mades-Johnstone.

¶ 11    Defendant was taken to Delnor hospital. Jerdee and another officer went to the hospital, where defendant was in the emergency room speaking with a social worker. The social worker asked the officers if they wished to speak with defendant, Jerdee replied that they did, and she left the room. Defendant told the officers:

> "that he did in fact send an e-mail to Jodee Blanco indicating that he was fed up with his current school, situation, and that–
>
> * * *
>
> And that he couldn't take any more of that situation, which prompted him to write the e-mail. He said that he was frustrated and wanted his parents, his grandparents, and Dean Shrader to suffer. He specifically stated in the e-mail that he wanted them to die."

In their meeting, Jerdee showed defendant the e-mail he had received, and defendant "alluded" that he was angry with Shrader because she placed him in the alternative school.

¶ 12    Defendant was next taken to St. Joseph's hospital in Elgin. Jerdee received a warrant for defendant's arrest, and on May 3, 2011, defendant was transported from the hospital to the police station. After he received *Miranda* warnings, defendant spoke with Jerdee and another officer about how he was feeling and the medications he was taking. They discussed the e-mail, and "he again told us that he knew that–he felt that it was inappropriate in sending it; however, he was frustrated at the time and that's why he sent that e-mail." Defendant

place," and, repeatedly, "Get me out," "Let me out," and "I can't take it." In addition, it states on the front, "They tried to get me out of New Directions, Geneva said Fuck you, they think it's for the best that I stay at Mades. No. They were wrong. Keeping me there is destroying my mental state of being. I can't stay there, wish me luck that the proper precautions are taken to get me out." The words "kill," "suicide," "death," "murder," and "blood and guts" are written on the front cover. In addition, the front cover contains several drawings, including one that reflects a person with a gun shooting someone in a window or doorway, and another that shows a building labeled "Mades" with what appears to be a bomb near it. Inside, the folder contains "My Will," which lists to whom various items should be given. Further, there is a drawing of a person holding a gun to his head. Finally, there are two paragraphs of writing, discussing burning down Mades, but saving the kids and committing suicide, as well as comments critical of defendant's mother and grandparents.

voluntarily provided a written statement, which included, "I wrote this e[-]mail because I was seeking help for depression, anger, and suicidal thoughts, and I had nobody around to talk about it with. I sent an e[-]mail to Jodee Blanco with words like 'I want to die,' 'I want my family dead' ... things like that, but I thought Jodee would understand. Problem was, somebody else read the e[-]mail first, and had to take precautions." Further, defendant wrote, "[b]efore writing this letter, I found out that the dean at Geneva was shocked that I wanted her dead, but I also found out that she couldn't tell me about any other kids['] consequences, even though she did everything that she could to help me. If she was here, I would look her in the eyes, and apologize for worrying her." The statement was received into evidence (exhibit No. 3).

¶ 13    The State rested. Defendant moved for a directed finding, arguing that the e-mail was not proven to have come from him; that the e-mail and folder reflected only his will, wishes, and private thoughts, not a threat; and that, even though his thoughts were disturbing, the State did not establish any intent to transmit a threat. The court denied defendant's motion for a directed finding. Defendant presented no evidence. The court found defendant guilty of disorderly conduct. It denied defendant's motion to reconsider. The court sentenced defendant to time served (101 days in jail), assessed various fines and fees, and imposed 30 months of probation, "the first 12 to be intensive." Further, it ordered defendant to continue his psychiatric treatment and to remain on GPS monitoring for the first 12 months of probation. Defendant appeals.

¶ 14                                    II. ANALYSIS
¶ 15                          A. Sufficiency of the Evidence
¶ 16    Defendant argues first that the evidence was insufficient to sustain his conviction because: (1) considering the e-mail's content and to whom it was sent, it did not contain a knowingly made death threat; and (2) the e-mail was inadmissible as substantive evidence because the State failed to authenticate it as having been authored by defendant.

¶ 17    We first address defendant's second argument. Defendant argues that, although the court initially sustained his foundation objection, its subsequent admission of the exhibit was erroneous because the State did not present evidence to show that he authored and sent the e-mail. Defendant notes that, although the e-mail's subject line states "Hey, Jodee, this is Dan Diomedes from Geneva," that statement is hearsay and could have been written by anyone. Further, defendant notes that the e-mail purported to be from "dan daman," which is not his name, and that the State did not provide any evidence that the e-mail was generated from his e-mail address. Accordingly, defendant argues, because the State did not directly link to him the Internet Protocol (IP) address from which the e-mail was sent, and because the circumstantial evidence was inadequate to authenticate the e-mail, it was inadmissible and his conviction must be reversed. We disagree.

¶ 18    We review a trial court's admission of evidence for an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion occurs only when no reasonable person would adopt the court's view. *Id.* Here, defendant is correct that the evidence did not directly establish that he sent the e-mail. However, as defendant acknowledges, a document can be authenticated through circumstantial evidence. See, *e.g.*, *People v. Towns*, 157 Ill. 2d 90, 104 (1993) (a written document can be authenticated through circumstantial evidence,

such as by "appearance, contents, and substance"). Here, viewing the evidence in its totality, we cannot conclude that the trial court abused its discretion in admitting the e-mail.

¶ 19    The e-mail reflects, in the subject line, "this is Dan Diomedes from Geneva." While this is clearly insufficient, alone, to establish that defendant was in fact the author, the trial court could certainly consider that subject line when viewing the evidence as a whole. Further, the body of the e-mail discussed that the author: (1) was expelled from Geneva High School for posting a threat on Facebook and was sent to an alternative school; (2) was upset at the Geneva High School's dean and described "her" as not addressing bullying; (3) wanted to return to Geneva High School, but the school refused to allow it; (4) was "suffocating" and unhappy in the alternative school environment; (5) had recently written suicide notes, a will, and a list of people whom he or she "was going to kill"; and (6) was not going to hurt any kids, but "wants" dead and "to suffer" the dean at Geneva, his or her grandparents, and his or her mother. Much of that information was also written on the folder that was confiscated from defendant and admitted into evidence at trial. (Indeed, in his appellate brief, defendant agrees that the "writings on the inside and outside of the folder mirror the remarks that [defendant] conveyed to Blanco in the email.") Accordingly, the trial court could reasonably have found that the person who wrote the e-mail was the same person who wrote the notes on the folder. Finally, in his voluntary written statement, defendant stated that he wrote "*this* e-mail" (emphasis added) to Blanco, which included phrases such as "I want to die" and "I want my family dead," and he further stated that he learned that Shrader was shocked that he wanted her dead. Jerdee testified that defendant wrote the voluntary statement while being interviewed about the e-mail that Blanco received and forwarded to the police. Moreover, Jerdee testified that, in his interview with defendant at the hospital, defendant admitted to having written the e-mail.

¶ 20    Contrary to defendant's assertion, the cases he cites do not stand for the proposition that, to connect the e-mail to him, the State was "obliged" to demonstrate that the IP address from which the e-mail was sent was connected to him. While, in those cases (both of which concerned computer-related crimes, such as computer tampering and electronic harassment), the State did offer IP addresses connected to the defendants, the courts did not hold or even suggest that an e-mail must be authenticated through an IP address or that circumstantial evidence is insufficient. See, *e.g.*, *People v. Kucharski*, 2013 IL App (2d) 120270, ¶¶ 10-12; *People v. Janisch*, 2012 IL App (5th) 100150, ¶¶ 8-9. Indeed, Illinois Rule of Evidence 901(b)(4) (eff. Jan. 1, 2011) illustrates that, where a document's contents, in conjunction with other circumstances, reflect distinctive characteristics, the authentication requirement may be deemed satisfied. In sum, the circumstantial evidence here was sufficient to establish that defendant wrote the e-mail, and the trial court did not abuse its discretion in admitting the e-mail into evidence.

¶ 21    Next, defendant argues that the evidence was insufficient to establish a knowing threat. The statute provides:

"(a) A person commits disorderly conduct when he [or she] knowingly:

* * *

(13) Transmits or causes to be transmitted a threat of destruction of a school building or school property, or a threat of violence, death, or bodily harm directed against persons at a school, school function, or school event, whether or not school is in session." 720 ILCS 5/26-1(a)(13) (West 2010).

Defendant argues that the State therefore needed to prove both that he knowingly sent the e-mail *and* that, when he sent the e-mail, he possessed a conscious awareness that he was transmitting a threat. Defendant argues that the State failed to do so here, where the evidence reflects that he sent the e-mail to a third party to express frustration with his situation and where, in his written statement, he explained that he sent the e-mail seeking help for depression and because he thought that Blanco would understand his feelings. Defendant argues that no rational fact finder could find beyond a reasonable doubt that he knowingly transmitted a threat directed against Shrader.

¶ 22    The State disagrees that it needed to establish anything more than that defendant knowingly sent a message that he knew *or should have known* was a threat. The State relies on *People v. Raby*, 40 Ill. 2d 392, 397 (1968), where the court held that a defendant is guilty of disorderly conduct if he or she knowingly committed an act in an unreasonable manner and "he [or she] knew or should have known [that it] would tend to disturb, alarm or provoke others." However, the court in *Raby* considered a section of the disorderly conduct statute, different from the one at issue here, that contemplates the state of mind of both the actor *and* those affected by the actor's conduct. *Id.* at 395; see 720 ILCS 5/26-1(a)(1) (West 2012) (formerly Ill. Rev. Stat. 1967, ch. 38, ¶ 26-1(a)(1)) ("[a] person commits disorderly conduct when he knowingly *** does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace"). Accordingly, the *Raby* court explained that "knowingly," which describes a "conscious and deliberate quality which negatives accident or mistake," requires that the actor must knowingly commit the act. However, as to how that act might affect another (*i.e.*, alarm or disturb), the lesser standard of "knew or should have known" applies. *Raby*, 40 Ill. 2d at 395, 397.

¶ 23    Here, in contrast to *Raby*, the disorderly conduct provision at issue does not contemplate a state of mind for those who might be affected by the actor's conduct. Rather, as relevant here, the provision requires only that the actor knowingly transmit a threat of violence, death, or bodily harm directed against persons at a school. 720 ILCS 5/26-1(a)(13) (West 2010). Accordingly, we interpret the knowledge requirement to apply to all elements of subsection (a)(13), such that the actor not only must knowingly transmit something, but must also know that what is being transmitted is a prohibited threat. Indeed, other statutes, wherein "knowingly" appears only at the statute's beginning, have been interpreted to apply the "knowingly" *mens rea* to all subsequent elements of the crime. See, *e.g.*, *People v. Frieberg*, 147 Ill. 2d 326, 347 (1992) (interpreting Controlled Substances Act)[4]; *People v. Hernandez*, 2012 IL App (1st) 092841, ¶ 31 (interpreting Identity Theft Law)[5]; see also 720 ILCS 5/4-3

[4]Specifically, where the statute provided that "any person who knowingly brings or causes to be brought into this State for the purpose of manufacture or delivery or with the intent to manufacture or deliver a controlled *** or counterfeit substance *** is guilty of controlled substance trafficking" (Ill. Rev. Stat. 1991, ch. 56½, ¶ 1401.1 (now 720 ILCS 570/401.1(a) (West 2012)), knowledge was required both for bringing the substance *and* for the end or aim of that activity. *Frieberg*, 147 Ill. 2d at 347.

[5]Specifically, where the statute provided that "[a] person commits the offense of identity theft when he or she knowingly: (1) uses any personal identifying information or personal identification document of another person to fraudulently obtain credit, money, goods, services, or other property" (720 ILCS 5/16G-15(a)(1) (West 2008)), knowledge was required both for the use of the information and for the information's belonging to another person. *Hernandez*, 2012 IL App (1st) 092841, ¶ 31.

(West 2012) ("If the statute defining an offense prescribed a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each such element."). Accordingly, here, because "knowingly" is placed at the beginning of the statute without further distinction within the provision, we agree with defendant that, for purposes of section 26-1(a)(13), the State was required to prove beyond a reasonable doubt that defendant knowingly, *i.e.*, consciously and deliberately, transmitted a threat directed against Shrader, not merely that defendant *should have known* he was transmitting a threat.

¶ 24    Nevertheless, when a defendant challenges the sufficiency of the evidence supporting his or her conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). It is the function of the trier of fact to weigh and resolve conflicts in the evidence and draw reasonable inferences therefrom. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). Here, we conclude that a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found beyond a reasonable doubt that defendant knowingly transmitted an e-mail that he knew contained a threat directed against Shrader.

¶ 25    Defendant argues that, because he was seeking help for his depression and intended his statements to Blanco to remain private, he did not knowingly transmit a threat directed against Shrader. Defendant concedes that the statute does not require that the threat be directly communicated to the subject of the threat. However, he asserts that the fact that he sent the message to Blanco nevertheless reflects that his goal was to elicit sympathy, not to intimidate the dean. Finally, he argues that a threat does not exist without evidence of a "present determination" to injure and that, here, the e-mail reflected only a past determination to injure. We disagree.

¶ 26    We acknowledge that the e-mail can be read, in part, as defendant's attempt to express to Blanco his depression and frustration with his life and school environment. However, defendant's e-mail did not express *only* emotions of frustration and anger. Defendant did not simply lament his life or even directly request any help. Rather, after expressing frustration and anger, the e-mail abruptly ended with a statement that defendant "wants" (present tense) the dean "dead" and for her "to suffer." Defendant argues that wanting a person dead is not illegal, but the sentence immediately preceding defendant's wish explained that defendant had been writing a list of people whom he was going to kill, with the final sentence clarifying that he was not going to hurt kids, but, rather, he "wants" (again, present tense) the dean and members of his own family "dead" and "to suffer." Viewing the evidence in the State's favor, a reasonable fact finder could conclude that, when read in its entirety, the message seeking sympathy from Blanco *also* included a present threat of injury or death to those specified, including Shrader.

¶ 27    Further, the e-mail itself provided sufficient evidence from which the trier of fact could have rationally concluded that, given his background, defendant knew that he was transmitting a threat. The e-mail summarized two previous instances wherein defendant's threats or suicidal and/or violent writings resulted in meaningful consequences. First, defendant wrote in the e-mail that, when he posted a threat on Facebook, he was expelled from Geneva High School. Second, defendant wrote in the e-mail that, when he created a will and a list of people whom he planned to kill, he was sent to the counselor's office. As such, a

rational trier of fact could conclude that defendant knew that, when he sent the e-mail in the middle of the night (at 1:37 a.m.) to Blanco (who, we note, was not an advisor, counselor, or psychologist, or anyone with whom defendant could legitimately expect a confidential relationship), lamenting his life, describing a list of people whom he was going to kill, and stating that he presently wants the dean "dead" and "to suffer," he was transmitting a threat against Shrader. In sum, given defendant's history (as provided within his own e-mail), we conclude that a reasonable fact finder could have found beyond a reasonable doubt that defendant knowingly transmitted a threat of violence, death, or bodily harm directed against Shrader.

¶ 28                                    B. First Amendment Issue

¶ 29     Next, defendant argues that his disorderly conduct conviction must be reversed because his e-mail to Blanco was not a "true threat" and, therefore, it constituted speech protected by the first amendment to the United States Constitution.

¶ 30     The first amendment prevents government from proscribing speech because of disapproval of the expressed ideas. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). As the disorderly conduct provision at issue here makes criminal a certain form of speech, it must be interpreted within the confines of the first amendment. See, *e.g.*, *People v. Redwood*, 335 Ill. App. 3d 189, 192 (2002). However, the first amendment permits restrictions on some forms of speech, including "true threats," which:

> "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.] The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Internal quotation marks omitted.) *Virginia v. Black*, 538 U.S. 343, 359-60 (2003).

See also *People v. Bailey*, 167 Ill. 2d 210, 227-28 (1995) (true threats are not entitled to first amendment protection); *People v. Sucic*, 401 Ill. App. 3d 492, 502 (2010) (same). If a defendant establishes that his or her speech did *not* constitute a true threat, the appropriate remedy would be to reverse his or her conviction of disorderly conduct. See, *e.g.*, *Sucic*, 401 Ill. App. 3d at 502-03. We review *de novo* whether a statement qualifies as protected speech under the first amendment. *Duncan v. Peterson*, 408 Ill. App. 3d 911, 918 (2010).

¶ 31     Defendant argues that we must look to the context of the e-mail to determine whether it contained a "true threat." Defendant asserts that "true threats" are statements that, in light of surrounding circumstances, "a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression of a purpose to inflict harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views, or other similarly protected speech." *In re Douglas D.*, 2001 WI 47, ¶ 34, 243 Wis. 2d 204, 626 N.W.2d 725 (citing *State v. Perkins*, 2001 WI 46, ¶ 29, 241 Wis. 2d 141, 626 N.W.2d 762). Defendant asserts that many jurisdictions, including the Seventh Circuit Court of Appeals, focus on what a "reasonable sender" would foresee the recipient would understand. See, *e.g.*, *United States v. Fuller*, 387 F.3d 643, 646 (7th Cir. 2004) (looking at how a "reasonable person would foresee that the statement would be interpreted"). Accordingly, defendant argues that, because it is evident from the surrounding circumstances that he meant only to share his

"dark thoughts," a speaker in his position would not reasonably foresee that Blanco and others would interpret the e-mail as a serious threat of harm. Finally, defendant asserts that, because the statements in his e-mail were ambiguous, as opposed to reflecting a specific plan to commit harm, his expression is similar to other cases where courts have held that "dark" communications were protected by the first amendment. See, *e.g.*, *In re George T.*, 93 P.3d 1007, 1009, 1016-18 (Cal. 2004) (student adjudged delinquent did not communicate a true threat where he joked about the Columbine shootings and shared with several students a poem entitled " 'Dark Poetry,' " which stated, " 'I am Dark, Destructive, & Dangerous. I slap on my face of happiness but inside I am evil!! For I can be the next kid to bring guns to kill students at school. So parents watch your children cuz I'm BACK!!' "; court found that the poem was ambiguous and equivocal and that there were no circumstances reflecting any animosity between the writer and other students with whom he shared the poem and no conduct to suggest the immediate prospect of execution of a threat to kill); *J.S. v. Bethlehem Area School District*, 807 A.2d 847, 851, 859-60 (Pa. 2002) (student expelled from school for creating a website entitled " 'Teacher Sux,' " which included a request for $20 to pay for a hitman, included a drawing of the teacher with her head cut off and blood dripping, and had a page entitled " 'Why Should She Die?' "; court found that there was no true threat because the totality of circumstances reflected that the threat was not communicated directly to the teacher, there was no evidence that the student had made similar statements to the teacher on other occasions, the website contained cartoon characters and compared the teacher to Adolph Hitler, and it was unclear whether the teacher had reason to believe that the student had more propensity to engage in violence than any other student his age); *Douglas D.*, 2001 WI 47, ¶¶ 1-10, 243 Wis. 2d 204, 626 N.W.2d 725 (student was adjudged delinquent for writing a story wherein the protagonist cut off the teacher's head and the teacher, upon reading it, interpreted the story as a threat; court found that the story was not a true threat because there was no evidence that the student had threatened the teacher in the past or that the teacher believed the student had propensity to commit violence and, further, the story contained hyperbole and attempts at jest and did not contain any language directly addressed to the teacher). Defendant notes that the recipients in the aforementioned cases were all frightened by the expressions of speech but that, nonetheless, the expressions did not equate to "true threats."

¶ 32    The State agrees that context must be considered when assessing whether a statement constitutes a true threat, but it asserts that most courts use an objective test to determine "if an ordinary reasonable recipient who is familiar with the context … would interpret [the statement] as a threat of injury." (Internal quotation marks omitted.) *United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012). The State notes that here an objective reasonable recipient, *i.e.* Blanco, who was familiar with the context of the e-mail, interpreted the statement as a threat of injury. In addition, the State notes that defendant's statement was also taken seriously by the police and the high school and that the e-mail itself referred to a prior threat. The State concludes that, because reasonable recipients interpreted the e-mail as a serious threat, defendant's e-mail was not protected. It further notes that the cases cited by defendant are distinguishable, and it asserts that this case is more like *In re A.S.*, 2001 WI 48, ¶ 3, 243 Wis. 2d 173, 626 N.W.2d 712, where the court found that a minor had made true threats when he told other children that he was going to kill everyone at a middle school and make people suffer, he made specific threats against several individuals (including that he

- 11 -

would " 'hang,' " " 'rape,' " and " 'make [them] suffer' "), and there was nothing in the statements or other context to suggest that the minor was engaging in jest, hyperbole, or political dissent. The State contends that defendant's e-mail constituted a true threat that does not fall within first amendment protections.

¶ 33 We must first address the suggested discrepancy between defendant's position, that our review should focus on what a reasonable speaker in his position would foresee, and the State's position, that we should focus objectively on how a reasonable recipient would interpret the communication. In essence, it appears that both are partially correct. While there exists a split of federal authority on whether we should focus on the "reasonable sender" of the communication or the "reasonable recipient" of the communication (see *White*, 670 F.3d at 509-10 (collecting cases)), both defendant and the State are asking us to view the issue from an objective, *not* subjective, approach. For example, in *White*, the case upon which the State relies, the court noted that its approach, which focuses on the reasonable recipient, is an objective one. *Id.* at 510. In *Fuller*, a case upon which defendant relies, the Seventh Circuit noted that it applies an objective "true threat" test that asks whether "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement[, *i.e.*, the recipient (not necessarily the subject of the threat),] as a serious expression of an intention to inflict bodily harm." (Internal quotation marks omitted.) *Fuller*, 387 F.3d at 646. In *United States v. Parr*, 545 F.3d 491, 499-500 (7th Cir. 2008), the Seventh Circuit discussed that there also exists a split of authority on whether (based on *Black*'s language that true threats encompass statements wherein the speaker *means* to communicate a serious threat to harm) a *subjective* element was introduced into the analysis or whether the traditional, objective reasonable-person test should continue to be applied. In doing so, however, it described the traditional objective test as asking whether a reasonable speaker would understand that his or her statement would be interpreted as a threat (the "objective 'reasonable speaker' " test) *or*, *alternatively*, whether a reasonable recipient would interpret the statement as a threat (the objective " 'reasonable recipient' " test). *Id.* at 499. The *Parr* court stated that "[t]his circuit has not yet addressed the issue," and it described its former decision in *Fuller* as merely "a post-*Black* true threats case applying, without reference to *Black*, the traditional objective 'reasonable person' test." *Id.* at 500.

¶ 34 Accordingly, it appears that the Seventh Circuit's approach has been, and remains, an objective one, which allows evaluation of the speaker's communication under either the reasonable-speaker or the reasonable-recipient test. Further, although courts in this state have not explicitly decided the issue, the approach also appears to be objective. For example, in *Sucic*, the defendant relied on *Black* to argue that a subjective approach should be applied to determine whether his statements amounted to true threats. *Sucic*, 401 Ill. App. 3d at 503. In addressing that claim, the court noted that, while there has been a federal split of authority interpreting *Black*, Illinois courts have found that the term "threat" implies generally that the expression has a "reasonable tendency to create apprehension that its originator will act according to its tenor." (Internal quotation marks omitted). *Id.*[6] This definition suggests that

---

[6] Interestingly, the *Sucic* court (which was considering the issue of threats as related to a cyberstalking statute) ultimately determined that it did not need to resolve whether *Black* added a subjective-intent requirement to the test for true threats, because the defendant had placed his subjective intent at issue by arguing that his statements were merely "spiritual," not threatening. *Sucic*, 401 Ill. App. 3d at 504. The trial court, as fact finder, rejected the defendant's argument and determined

- 12 -

an objective, not a subjective, approach continues to apply. See also *People v. Peterson*, 306 Ill. App. 3d 1091, 1102-03 (1999) (considering threats under the intimidation statute and rejecting the defendants' argument that their speech was protected, noting that " 'punishable threats' " are those that have a "reasonable tendency to create apprehension," which is "essentially an objective determination").

¶ 35 Therefore, it appears that neither the objective reasonable-speaker nor the objective reasonable-recipient approach is foreclosed from our consideration. Indeed, in our view, the reasonable-speaker test, by requiring consideration of how others might interpret the communication, essentially subsumes or encompasses the reasonable-recipient test.[7] In any event, even applying, per defendant's request, the reasonable-speaker approach, we conclude that the evidence here is such that a speaker would reasonably foresee that a listener would reasonably interpret the communication as a serious expression of intent to harm.

¶ 36 We acknowledge first that, when compared with some of the foregoing cases, there are some factors here that could weigh against finding a serious threat. For example, as defendant points out, his e-mail was not as graphic as some of the expressions in the above cases found to constitute protected speech, he did not transmit the e-mail directly to the target of the alleged threat, and the record contains no evidence of any specific prior threats he

that the statements were clear threats directed at the victim. Therefore, the court essentially determined that, regardless of the test, any subjective-intent element was satisfied. *Id.* A similar analysis could be performed here. Defendant wishes us to find that, given all circumstances, he did not communicate in his e-mail a serious expression of an intent to harm a particular individual. However, as in *Sucic*, defendant argued at trial that the e-mail was meant only to convey anger and frustration, not to threaten. The trial court rejected that explanation, much as it could have rejected the explanation had defendant testified that he had no subjective intent to threaten, and it found the testimony not credible. Instead, the court found that the threat was serious. For many of the reasons discussed in our sufficiency analysis above, the evidence supports that finding.

[7]The Eleventh Circuit Court of Appeals, in *United States v. Alaboud*, 347 F.3d 1293, 1297 n.3 (11th Cir. 2003), concluded similarly, noting:

"While neither the government [n]or [the defendant] contest[s] that we use an objective standard in determining whether a communication is a threat, the government in its brief makes an issue of the distinction between 'listener-based' and 'speaker-based' tests. A 'speaker-based' test is whether the person uttering the statements should be held to reasonably foresee their effect on the recipient. *See*, *e.g.*, *United States v. Fulmer*, 108 F.3d 1486, 1491-92 (1st Cir. 1997). On the other hand, a 'listener-based' test is whether a person hearing the remarks would reasonably interpret them as an expression of an intent to harm. *See*, *e.g.*, *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994).

This Court has not specified if we use a 'listener-based' or 'speaker-based' test because there is no need to make this determination. Both tests are basically a 'listener-based' test. If we were to employ the 'speaker-based' test, the jury would have to decide how a reasonable listener would understand the communication in order to determine how a reasonable speaker would foresee the effect of his or her communication. *See* Jennifer Rothman, *Freedom of Speech and True Threats*, 25 Harv. J.L. & Pub. Pol'y 283, 303 (Fall 2001). That is why, in [*United States v. Callahan*, 702 F.2d 964 (11th Cir. 1983)], we never specified if we have a 'listener-based' or 'speaker-based' test, but rather simply asked how a 'reasonable person would construe' the communication. *Callahan*, 702 F.2d at 965 ***." (Emphases omitted.)

- 13 -

made against Shrader. Nevertheless, more circumstances weigh in favor of finding a serious expression of intent to harm. First, regardless of the lack of details, the e-mail reflected that defendant made a previous threat on Facebook that resulted in his expulsion from his high school. It does not really matter that we know nothing about the contents of that former threat: if it was graphic or related to Shrader, it weighs in favor of a finding that the e-mail may be viewed as a second and/or serious threat directed against her. If, instead, it was not particularly graphic or not related to Shrader, it supports a finding that, given that it nevertheless resulted in expulsion, a serious consequence, defendant was on notice that the contents of his e-mail would cause a reasonable recipient to fear violence. Second, unlike a Facebook post or a website, available to many, defendant sent his e-mail only to a single and specific recipient, Blanco, and the tenor of the e-mail was very serious and did not contain any jest, hyperbole, or political dissent. Together, these factors support a finding that the threat was serious. Third, the e-mail complained that defendant desperately "needs" to leave his alternative school environment, that Geneva High School will not take him back, and that he wants the dean of that high school dead. The e-mail reflects that defendant had written a list of people whom he was going to kill, and he specifically identified at least some of those individuals. Accordingly, the totality of the circumstances suggests a "true threat."

¶ 37 We feel compelled to note that we are sympathetic to the fact that defendant was clearly experiencing emotional difficulties when he wrote this e-mail. We have no doubt that the e-mail did, in part, constitute, as defendant puts it, "an expression of teenage despair." We understand that, in her position as an anti-bullying activist, Blanco encourages students and others to reach out to her through her "activist e-mail" address and that, in that sense, defendant felt encouraged to communicate his emotions with her. Nevertheless, defendant did more than simply express his emotions. Again, Blanco is not a trained therapist or a professional with whom defendant shared a confidential, privileged relationship (and, of course, even such professionals may report serious threats against others (see 740 ILCS 110/11 (West 2012)). The e-mail's tenor, defendant's history of making at least one prior threat and purportedly, in close temporal proximity to the e-mail, a list of people whom he was going to kill, and the e-mail's expression of defendant's present wish for specific individuals to die and suffer are circumstances sufficient for us to find that a reasonable sender would foresee that a reasonable recipient would view it as a serious threat to harm another (and, here, Shrader specifically). Accordingly, we reject defendant's argument that the e-mail was not a true threat.

¶ 38                                          III. CONCLUSION
¶ 39 For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 40 Affirmed.